**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SYRENTHIA DYSART,

       Plaintiff,

v.                                                                  Case No: 8:13-cv-2499-T-35EAJ

PALMS OF PASADENA HOSPITAL, LP,

       Defendant.

_____

## ORDER

**THIS CAUSE** comes before the Court for consideration of the Motion for Partial Summary Judgment (Dkt. 34) filed by Plaintiff, Syrenthia Dysart ("Dysart"), the Response in opposition thereto filed by Defendant, Palms of Pasadena Hospital, LP ("the Hospital") (Dkt. 48), as well as Defendant's Motion for Summary Judgment (Dkt. 45), Plaintiff's response in opposition thereto (Dkt. 50), and Defendant's Reply is support (Dkt. 51). The Court held a hearing on the motions and other pre-trial matters on February 9, 2015. Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** Plaintiff's Motion for partial summary judgment and **DENIES** Defendant's motion for summary judgment.

Also before the Court are Defendant's Motion in Limine to Bifurcate Trial (Dkt. 56), Defendant's Motion in Limine regarding Medicare/Medicaid Compliance (Dkt. 57), Plaintiff's Motion in Limine regarding Patient X's Defining Characteristics (Dkt. 58), and Plaintiff's Motion in Limine regarding Medical Justification for Discrimination (Dkt. 59). As explained at the hearing and further below, the Motion to Bifurcate Trial (Dkt. 56) is

**DENIED**, the Motion in Limine regarding Medicare/Medicaid Compliance (Dkt. 57) is **DENIED** (but the evidence is admitted for a limited purpose), the Motion in Limine regarding Patient X's Defining Characteristics (Dkt. 58) is **GRANTED**, and the Motion in Limine regarding Medical Justification for Discrimination (Dkt. 59) is **DENIED**.

## I.   BACKGROUND

Plaintiff Dysart, an African-American woman, is employed by the Hospital as a Licensed Practical Nurse ("LPN"), a position she continues to hold.  (Dkt. 49 at 1)  At all times relevant to this lawsuit, Plaintiff worked as an LPN in the Two Bayview Unit.  (Id.)  However, Plaintiff (as well as other Hospital LPNs) was required to "float" to other departments from time-to-time.  (Id. at 2)  By all accounts Plaintiff Dysart is a competent, well-respected nurse whose care competence has not been called into question.

On or about August 22, 2013, Patient X,[1] an elderly Hispanic female, who had been mugged by an African America male, was admitted to the Hospital's Emergency Room ("ER").  (Id. at 1)  On August 24, 2013, Patient X was transferred to the Acute Rehab Unit.  (Dkt. 46-3)

For reasons explained further below, the Hospital directed that, while in the Acute Rehab Unit, Patient X should not be treated by African Americans or other dark-skinned people.  (Dkt 42 at 10–12; Dkt. 37 at 9–10, 12–14; Dkt. 36 at 12–13, 20–22, 24; Dkt. 38 at 25–26; Dkt. 41 at 28)  A sign was placed on Patient X's door that stated in sum and substance that hospital staff must: "please report to nurse's station before entering room." (Dkt. 36 at 15)  In accordance with this instruction, all African Americans and some dark

---

[1] Throughout this litigation the parties have referred to the patient at the center of this dispute as Patient X. Because the patient's true identity is irrelevant to the resolution of this matter, and revealing it would impinge on the patient's privacy rights, the Court will likewise conform to this naming convention.

skinned individuals of a different ethnicity who reported to the nurse's station, would be directed not to deliver food into the room or provide any typical hospital services to Patient X.  Instead, a white individual would be tasked to provide services to the patient.  (Dkt. 36 at 16–17, 20–21; Dkt. 38 at 24)  This directive applied to all hospital personnel, including, for example, Dietary Aids, nurses, and physical therapy staff.  (Dkt. 36 at 20–22; Dkt. 38 at 25–26; Dkt. 37 at 15–17; Dkt. 40 at 11–12)

On or about September 1, 2013, Plaintiff was assigned as a floater to the Acute Rehab Unit and was initially assigned to Patient X by Mary Terlecki, the Charge Nurse. (Dkt. 49 at 2)  Overlooking the note, Plaintiff entered Patient X's room and began performing an assessment on Patient X.  (Id.)  Nothing in the record suggests that Patient X objected at that time to Plaintiff Dysart's presence.  (Dkt. 46-1 at 13)  Even so, Ms. Terlecki entered the room, accompanied by Richard McGuire, a male Caucasian Registered Nurse in the Acute Rehab Unit, and told Plaintiff that she needed to speak with her. (Dkt. 49 at 2)  Plaintiff followed Ms. Terlecki and Mr. McGuire into the doorway of the room, and Ms. Terlecki informed her that Mr. McGuire would be replacing Plaintiff as the nurse for Patient X for that shift.  (Id.)   Ms. Terlecki explained that Patient X was admitted to the Hospital because she had been mugged by an African American male and sustained severe injuries as a result, and thus dark-skinned Hospital staff were being excluded from her care.  (Dkt. 46-1 at 13–14; Dkt. 36 at 26–27)  The Hospital contends variously that Patient X made a "no blacks" demand, that her daughter made the request, and/or that the Hospital determined on its own that it would be in Patient X's best interest to impose such a restriction.  In any event, the decision was made, the offending sign was posted, and the Charge Nurse informed all African Americans, including Plaintiff Dysart,

and one dark complexioned Indian care provider that they would not be permitted to provide care to Patient X because of the color of their skin.  (Dkt. 36 at 20–21)

Plaintiff became upset over being removed from Patient X's care and immediately left the Acute Rehab Unit.  (Dkt. 49 at 2)  Plaintiff called the supervisor on-duty at the time and informed her of the situation. The supervisor told Plaintiff that she could return to a different area of the hospital, Two Bayview, and that she would send another nurse to the Acute Rehab Unit to provide care to Patient X.  (Id.)  Plaintiff then returned to the Two Bayview Unit.  (Id.)

On or about September 3, 2013, Plaintiff called the Hospital's Human Resources office to report her concerns regarding being removed from Patient X's care on the basis of her race.  She left a message requesting that Karen Casteel, Human Resources Director, return her call.  (Id.)  Ms. Casteel forwarded Plaintiff's message to the Chief Nursing Officer, Andrea Clyne.  (Id.)  That same day, Ms. Clyne called Plaintiff and asked to meet with her.  (Id. at 3)

During their meeting, Plaintiff expressed her concern over being removed from Patient X's care and Ms. Clyne explained that she would investigate the matter, consult with Brian Flynn, CEO at the time, and get back to Plaintiff.  (Id.)  Prior to the meeting with Plaintiff, Ms. Clyne spoke with Kerry Daum, Nurse Manager for the Acute Rehab Unit, and after the meeting, she consulted with Ms. Casteel and Mr. Flynn.  (Id.)   That same day, on or about September 3, 2013, Ms. Clyne met once again with Plaintiff.  (Id.) Despite available information concerning anti-discrimination policies of which the Hospital claimed knowledge and adherence, and the availability of access to legal counsel, with whom the Hospital claimed it did not consult, Ms. Clyne communicated to Plaintiff Dysart

that the Hospital upheld the decision to prevent Plaintiff and other African American and dark complexioned staff from providing care to Patient X.  (Dkt. 46-1 at 16)  As Karen Casteel, the Hospital's Director of Human Resources, acknowledged in her deposition:

> Q. But you would agree that who was providing services to this patient, those decisions were made based upon the race of the staff member, correct?
>
> A. Repeat that.
>
> Q. Sure. The people who were providing services to this patient, who those people were, those decisions were made based upon their race, correct?
>
> A. In this incident, yes.
>
> Q. Well, not just with respect to Miss Dysart, but also with respect to dietary services staff, correct?
>
> A. Correct.
>
> Q. And also with respect to the physical therapy staff, correct?
>
> A. Correct.

(Dkt. 38 at 25–26)

The Hospital's only response, acknowledging the upsetting nature of this race based decision, was to offer Plaintiff paid vacation for her aggravation and inconvenience. (Dkt. 46-1 at 16; Dkt. 41 at 26; Dkt. 38 at 21)  Whereupon, this litigation ensued.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)).  Which facts are material depends on the substantive law applicable to the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party.  Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356).  A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case.  Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial.  Porter v. Ray, 461 F.3d 1315, 1320-1321 (11th Cir. 2006) (citation omitted).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it.  Fed. R. Civ. P. 56(e).

III.   **DISCUSSION**

   **A. Liability for Racial Discrimination**

42 U.S.C. § 1981 applies to claims for intentional racial discrimination in "the making, performance, modification, and termination of [employment] contracts" and in "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981; Vincent v. Wells Fargo Guard Services, Inc. of Fla., 3 F.

Supp. 2d 1405, 1413 (S.D. Fla. 1998).   "[T]he test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment causes."   Brown v. Am. Honda Motor Co., Inc., 939 F.2d 946, 949 (11th Cir. 1991).

"An employee who adduces direct evidence of disparate treatment on the basis of race makes out a prima facie case of intentional discrimination.  The burden of persuasion then shifts from the employee to the employer, who must rebut the direct evidence of discrimination by affirmatively proving that it would have made the same decision even if it had not taken race into account."   Ferrill v. Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999).  Moreover, "[a]n employer's intentional creation and maintenance of racially segregated crews is just as invidious and offensive to the notions of equality at the heart of Title VII and § 1981 as would be segregated water fountains, one labeled for whites and the other labeled for blacks, or segregated rest rooms, one labeled for whites and one labeled for blacks.  Such intentional racial segregation in the workplace, even without loss of tangible benefits, is invidious and offensive because it is inherently demeaning."   Hunter v. Army Fleet Support, 530 F. Supp. 2d 1291, 1295 (M.D. Ala. 2007).

In Ferrill, the leading case in the Eleventh Circuit on race-matching in the workplace, the defendant was a telephone marketing corporation often hired by political candidates to make "get-out-the-vote" calls.   Id. at 471.  "Approximately 10% of such calling [was] race-matched, such that black voters are called by black [ ] employees who use the 'black' script, while white voters are called by white [ ] employees who use a different, 'white' script."   Id. at 471.  After being terminated on the basis of a reduction in force immediately following the November 1994 election, Plaintiff brought a claim alleging

racial discrimination in her termination and job assignment under 42 U.S.C. § 1981.  Id.

at 471–72.

The defendant "admitted that the 1994 assignments of 'get-out-the-vote' calls and

scripts were made on the basis of race . . . .  [Defendant]'s admission is direct evidence

of disparate treatment on the basis of race and sustains Ferrill's prima facie case."  Id. at

472 (footnote omitted).

The Eleventh Circuit continued:

> Implicit in the District Court's finding is the notion that racial
> animus and intent to discriminate are not synonymous.  In its
> Memorandum Opinion, the District Court stated that there is
> "no evidence" that TPG acted with any racial animus.  **The
> crucial issue then is whether a defendant who acts with
> no racial animus but makes job assignments on the basis
> of race can be held liable for intentional discrimination
> under § 1981. Clearly, the answer is yes.**

Id. at 472–73 (emphasis added).

Thus, Ferrill instructs that in direct evidence, race-matching cases—i.e., cases in

which an employer requires that only a specific race be used in servicing a particular

customer/client, be that African Americans calling African Americans on behalf of the

client, or light-skinned, non-African American people only giving care to a light-skinned

patient—a prima facie case is established where Plaintiff's direct evidence of

discrimination goes unrebutted.  Ferrill, 168 F.3d at 472; see also Knight v. Nassau

County Civil Serv. Comm'n, 649 F.2d 157, 162 (2d Cir. 1981) (finding that Plaintiff who,

"although his salary and benefits remained unchanged," was assigned to perform minority

recruitment because his employer believed "that blacks work better with blacks and on

the premise that [Plaintiff's] race was directly related to his ability to do the job," could

recover, holding that "the fact remains that Knight was assigned a particular job (against

his wishes) because his race was believed to specially qualify him for the work. This is a violation of Title VII.").

In <u>Ferrill</u>, the defendant "admitted that the 1994 assignments of 'get-out-the-vote' calls and scripts were made on the basis of race and that [its] employees were segregated on the basis of race," and thus the Court concluded that the defendant's "admission is direct evidence of disparate treatment on the basis of race and sustains Ferrill's prima facie case." <u>Ferrill</u>, 168 F.3d at 472. The <u>Ferrill</u> Court then upheld the District Court's reliance "on that unrebutted evidence to find [defendant] liable for intentional race discrimination in job assignments in violation of § 1981." <u>Id.</u>

Here, the defendant Hospital declines to make such a concession so the Court must proceed through the paces, which lead inexorably to the same outcome.

As its first line of defense, the Hospital refuses to concede that it promulgated a transparent policy concerning race-matching at the patient's request, presumably because it appreciates on the authority of <u>Ferrill</u> that such a policy would be illegal. This line of defense is first and foremost legally unsound. An unwritten, race-matching, client triggered policy is no less invidious and fares no better under legal scrutiny. Indeed, some might even suggest a hidden policy is all the more invidious because it cannot be tested or challenged unless someone astute enough and courageous enough learns of and then questions the implementation of the "unwritten policy" on an ad hoc basis. Suffice it to say that the law is unwavering and cases legion that expressly prohibit unwritten discrimination: "it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 801 (1973).

Moreover, the facts do not support the defense that there was no policy.   The record is uncontroverted that the decision to prohibit African Americans and dark complexioned staff members from participating in Patient X's care was approved all the way up the chain of command, including by the CEO.   That is by definition a policy. Moreover, the uncontroverted testimony of everyone with any controlling voice in the matter confirmed that race-matching at the behest of Patient X was not viewed by management as a violation of any Hospital policy.   Specifically, Mr. Flynn, the CEO, and Ms. Clyne, the Chief Nursing Officer, testified that the decision was, in fact, "consistent with hospital policy."   (Dkt. 35 at 30); see also (Dkt. 36 at 43–45; Dkt. 43 at 27).   Thus, the CEO Mr. Flynn testified:

> Q. Okay. Well, do you think it was consistent with hospital
> policy to honor the patient's request, or the patient's family
> member's request, that they not be treated by African
> Americans?
>
> A. Yes.
> . . . .
>
> Q. Sure. Well, to your knowledge, is there any policy at the
> hospital-- well, let me ask you a different question. You
> would agree that, in this instance, the hospital honored a
> race-based staffing request, correct?
>
> A. I would agree that the hospital honored -- yes.

(Dkt. 35 at 30, 39)

Likewise Ms. Clyne, who investigated Plaintiff's complaint, testified:

> Q. So in your mind under the hospital's established guidelines
> what happened on that day was appropriate?
>
> A. Yes.
>
> . . . .

> Q. And it's your understanding and I think your testimony is that during the entirety of the stay the hospital endeavored to honor the patient, what you believed to be the patient's request as to the color of the skin of the caregiver, correct?
>
> A. Yes.

(Dkt. 41 at 30, 38–39)

Finally, the policy was not hidden in any event.  The determination was enforced by a sign posted on the patient's door that directed personnel to be screened by a white charge nurse for acceptable race and skin color before they could enter the hospital room. Moreover, no one who made or implemented the decision was called to task for doing so or was otherwise reprimanded, confirming that the decision was consistent with the Hospital's policy.  Pursuant to the Hospital's determination as communicated by Ms. Clyne, this race-based staffing decision was continued on behalf of Patient X until she was discharged from the Hospital's Acute Rehab Unit on or about September 11, 2013. Finally, the Hospital notes that no evidence has been adduced that this unwritten race based policy has been implemented prior to or after this event; however, Ms. Clyne did not rule out the possibility that it could be implemented in the future:

> Q. To your knowledge did anyone make a statement to the effect of on a going-forward basis we are not going to honor the request that African Americans do not provide care to Patient X?
>
> A. I don't believe so.
>
> Q. So as far as you know the hospital continued to honor the request that African Americans not provide patient care, correct?
>
> A. To that patient?
>
> Q. Yes.
>
> A. Correct.

(Dkt. 41 at 28)

The Hospital alternatively seems to argue semantically that the decision to staff Patient X with whites only was not "based on" Plaintiff Dysart's race, but "based on" the need for care of the patient or the patient's request.  If this is anything more than a poor attempt at clever wordsmanship, the Hospital is confused.   The test for racial discrimination looks to the race of the Plaintiff.  If she would have been treated differently, but for her race, the decision is raced based.  Here it is undisputed that if Plaintiff Dysart had not been African American or dark skinned, she would have been allowed to provide standard nursing services to Patient X.  Motivation for such a race based decision is a different question entirely.

Concerning its motivation for the race based decision, then, the Hospital argues that Plaintiff and other dark-skinned staff members were not excluded because of any racial animus on the part of the Hospital, but because such exclusion was necessary for Patient X's treatment and recovery.  This is so, the Hospital argues, because Patient X reacted extremely negatively to even seeing an African American in the halls or gym of the Hospital.

In this regard, the uncontroverted record evidence is this case establishes that Patient X was admitted to the Hospital's ER for injuries allegedly sustained as a result of an attack by an African American male who threw Plaintiff to the ground while taking her purse.  (Dkt. 46-2 at 3–4; Dkt. 43 at 10)  Patient X sustained fractures to her pelvis and arm.  (Dkt. 46-2 at 3, 5–6)   The record evidence is also uncontroverted that on several occasions, upon seeing any dark-skinned person, Patient X would "freak out," (Dkt. 40 at 4, 8–9, 12, 42), including shaking, crying, stating that she did not want a black therapist,

12

and even becoming incontinent of urine.  (Dkt. 40 at 16–18; Dkt. 42 at 7–9)[2]  Indeed,

Patient X's irrational aversion to people of color was so strong that in one instance she

had a negative reaction when she saw a putting green, which was outlined in black,

leaning against a wall in the Hospital's gym.  (Dkt. 42 at 9–10)

While these factual occurrences all appear essentially uncontroverted on the

record before the Court, and while the court acknowledges the difficult posture the

patient's circumstances presented, these factors are wholly irrelevant, at least for

purposes of liability for racial discrimination.  The Hospital, in essence, is attempting to

assert a "legitimate, discriminatory reason" for its actions: Patient X's health and recovery.

However, while a legitimate, *non*-discriminatory reason would be a defense in a

circumstantial evidence case,[3] there is no legitimate, *discriminatory* reason defense

recognized by law even in that context and certainly it would not be recognized in an

intentional discrimination, race-matching case such as this one.  In point of fact, most

race-matching cases occur as a result of a claimed legitimate need or desire to select a

specific race for a task or preclude a specific race from an opportunity or task.

Alternatively, if the Hospital is attempting to exonerate itself from a discrimination claim

by showing that its decision was not based on racial animus toward Plaintiff, that effort

too fails.  As <u>Ferrill</u> explained: "The crucial issue then is whether a defendant who acts

---

2 Plaintiff suggested at the hearing on the motions for summary judgment that Patient X's incontinence was disconnected from any racial fear and started prior to the issues in dispute here. This matter remains in dispute.

3 <u>See, e.g.</u>, <u>Kidd v. Mando Am. Corp.</u>, 731 F.3d 1196, 1202 (11th Cir. 2013) ("[P]laintiff must establish by a preponderance of the evidence a prima facie case of discrimination. If she does, the burden of production shifts to the employer, which requires the employer to introduce evidence of 'some legitimate, nondiscriminatory reason' for its employment decision." (quoting McDonnell Douglas, 411 U.S. at 802)).

with *no racial animus* but makes job assignments on the basis of race can be held liable for intentional discrimination under § 1981. Clearly, the answer is yes." <u>Ferrill</u>, 168 F.3d at 472–73 (emphasis added).

Likewise, Defendants have not and cannot assert a Bona Fide Occupational Qualification or Business Necessity defense, the only potentially recognized exceptions to intentional discrimination under § 1981.  As <u>Ferrill</u> made clear, the law does not recognize a race-based bona fide occupational qualification or business necessity defense in this context:

> An employer may intentionally discriminate "on the basis of ... religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise...." 42 U.S.C. § 2000e–2(e)(1). The bona fide occupational qualification ("BFOQ") defense is an extremely narrow exception, and is *not* available for racial discrimination. Because § 1981 proscribes discrimination solely on the basis of race, and the BFOQ defense does not apply to racial discrimination, the BFOQ defense is **never** available to the § 1981 defendant.
>
> An employer may assert "business necessity" as a defense to claims that facially neutral employment practices have discriminatory effects. . . .  When a facially neutral practice is challenged for its disparate impact, an employer need not assert a BFOQ for justification, but may argue instead that the practice is grounded in a legitimate, job-related purpose. Because § 1981 liability must be grounded on intentional discrimination, and the neutral practice mode of proof is inapposite in § 1981 cases, the business necessity defense is not available to the § 1981 defendant.

<u>Ferrill</u>, 168 F.3d at 473–74 (emphasis added) (footnotes and citations omitted).  Thus, the court reasoned, "it is clear that the BFOQ and business necessity defenses are not available to a defendant who, like TPG, is accused of intentional discrimination on the

basis of race in violation of § 1981." Id. at 474.  Consequently, the Hospital's explanation for its actions, even if it were couched as a BFOQ or business necessity, would be no defense to liability.[4]

Accordingly, the Court finds that all of the Hospital's defenses, real and feigned, fail, and that the Hospital did discriminate against Plaintiff by "mak[ing] job assignments on the basis of race." Id. at 473.  In short, it refused to allow Plaintiff to care for Patient X based solely on the color of Plaintiff's skin.  Whether that refusal came about because Patient X and/or Patient X's family requested only light-skinned caregivers, or because the Hospital staff believed that excluding African Americans and other dark-skinned minorities was in the best interest of Patient X's health and recovery, the result is the same: Plaintiff was prevented from performing her job because she is an African American.  Such intentional racial discrimination is prohibited by § 1981.

The Eleventh Circuit has succinctly held: "An employee who adduces direct evidence of disparate treatment on the basis of race makes out a prima facie case of intentional discrimination." Ferrill, 168 F.3d at 472.  Thereafter, Defendant must rebut the direct evidence by proving that it would have made the same decision even if it had not taken race into account. Id.  Like the Defendant in Ferrill, the Hospital cannot make such a showing as Plaintiff's race was the only relevant criteria at play in deciding to exclude her from Patient X's care.  That is to say, the Hospital admits, albeit reluctantly, that but for Plaintiff's race she would have been allowed to treat Patient X.

---

4 The Court would note that the record does not reveal that any doctor prescribed a "no African American or dark skinned caretaker" directive as a part of Patient X's physical or psychological care and treatment. Hence, Defendant likely could not prove a BFOQ in any event. (Dkt. 41 at 42–43) ("Q. But there was no physician order that the patient was not to be treated by African Americans, correct? A. Correct. . . .  Q. Was there any part of the nursing care plan for Patient X that stated that she was not to be treated by African Americans? A. I do not believe so.")

**B.  Adverse Employment Action**

The Hospital's final defense is that even if its intentional decision to make job assignments on the basis of race violated § 1981, Plaintiff's claim fails as a matter of law because she cannot show she suffered an adverse employment action.  The Ferrill court made short shrift of this suggestion.   Upholding a jury verdict of $500.00, the Court explained as follows:

> Although compensable damage must be proven, general compensatory damages, as opposed to special damages, need not be proven with a high degree of specificity. Compensatory damages may be inferred from the circumstances as well as proved by the testimony. Ferrill's testimony that the terms, conditions, and privileges of her employment were adversely affected by TPG's disparate treatment of employees on the basis of race was sufficient evidence of harm. Any evidentiary shortcomings go more to the amount, rather than the fact, of damage, . . . .

Ferrill, 168 F.3d at 476 (internal quotations and citations omitted).  This is as it should be in a raced based assignment case in the face of intentional discrimination.  Almost invariably in a large institution, such as in a hospital, there will be more than a sufficient number of "approved race" clients to which a person could be assigned and more than enough work to keep them gainfully employed.  Thus one might expect that the tangible loss the person suffers will not comprise a substantial economic loss.  Even so, the harm to the offended person and the harm to the purposes and principles underlying § 1981 are palpable.   To preclude a claim from progressing in the absence of substantial economic losses ignores this harm and the purposes and principles attendant to the Act.

The Court went on to find that the amount of Ferrill's damages properly included recovery for her emotional harms.  In so doing, the Court explained:

> A plaintiff may be compensated for intangible, psychological injuries as well as financial, property, or physical harms. The Supreme Court has indicated that a plaintiff may recover for emotional harm under § 1981. Ferrill testified that she was humiliated by TPG's physical separation of employees on the basis of race and by TPG's allocation of work and scripts according to race. Humiliation and insult are recognized, recoverable harms.

Id. at 476 (citations omitted).

The Court is mindful that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001). Rather, to be actionable an "adverse employment action" must constitute "a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. at 1239 (emphasis in original).

In this instance, Plaintiff Dysart was removed from a patient's room because of her race. She was affronted by what was in effect a "no blacks allowed" sign posted on the patient's door. She was expressly told her reassignment was because she was African American. She was replaced by a white nurse. She was sent to work in a different area of the hospital during the stay of Patient X. When she complained, she was rebuffed by management and sent home on paid leave. When she returned, the "no dark people allowed" policy was still in place, and it was allowed to stand for seventeen (17) full days[5]

---

[5] Beginning sometime on August 25, 2013, following physical therapy assistant Donna Pierce's recommendation to Charge Nurse Lori Traxler (Dkt. 42 at 10–11; Dkt. 37 at 9–12), until Patient X's discharge on September 11, 2013 (Dkt. 49 at ¶ 20; Dkt. 41 at 38–39).

until Patient X was discharged.  Whether these employment actions are deemed to be materially adverse as viewed by a reasonable person in the circumstances is a factual dispute that is left to be determined by the ultimate collective "reasonable person"—the jury that will hear this case.[6]

Likewise, the issue of Plaintiff's damages must go to the jury.  That is to say, as in Ferrill, the jury must decide whether Plaintiff's testimony provides sufficient evidence of compensable harm.

## IV.    MOTIONS IN LIMINE

Because the record before the Court shows that Plaintiff was immediately informed of the Hospital's justification for excluding her from Patient X's care (Dkt. 46-1 at 13–14), Defendant may present evidence of that justification to contextualize Plaintiff's alleged mental and emotional harm resulting from her exclusion.  Likewise, the justification evidence is also relevant to whether Defendant is liable for punitive damages, as an award of punitive damages requires Plaintiff to "show that the defendant acted with malice or reckless indifference to the plaintiff's federally protected rights."  Ferrill, 168 F.3d at 476. As such, Plaintiff's Motion in Limine seeking to exclude such evidence (Dkt. 59) is **DENIED**.

To the extent that motion also seeks to exclude Patient X's medical records on non-relevance grounds, or as hearsay, the Parties agreed at the hearing to work together to limit the amount of medical records and potentially the number of such objections.

---

6 The Hospital's reliance on Grimsley v. Marshalls of MA, Inc., 284 Fed. Appx. 604, 605 (11th Cir. 2008), is misplaced.  First, Grimsley is an unreported per curiam opinion, and it has no precedential value.  Second, it is not a race-matching case, and its facts are not analogous to those presented here.

Thus, the Court will address any remaining evidentiary objections to the medical records at trial.

In Plaintiff's Motion in Limine regarding Patient X's Defining Characteristics (Dkt. 58), Plaintiff seeks to exclude that Patient X was an "elderly, Hispanic woman," because such evidence is irrelevant.  Defendant agrees that neither Patient X's race nor ethnicity is relevant, but argues her age is relevant to explain her injuries, and, relatedly, the Hospital's justification for excluding Plaintiff from her care.  (Dkt. 64 at 2)  The Court finds that Patient X's age is no more relevant than her race.  Defendant may present evidence regarding the extent of her injuries.  Accordingly, Plaintiff's Motion in Limine regarding Patient X's Defining Characteristics (Dkt. 58) is **GRANTED**.

As explained at the hearing, Defendant's Motion in Limine regarding Medicare/Medicaid Compliance (Dkt. 57) is **DENIED,** but the evidence may be presented for a limited purpose.  Plaintiff may offer into evidence the exhibit showing that Mr. Flynn certified that the Hospital was Title VII compliant for the limited purpose of showing that Defendant was on notice of and acknowledged its obligations under Title VII, in order to attempt to prove that the Hospital was therefore recklessly indifferent to Plaintiff Dysart's rights as relevant to the punitive damages claim.

The Motion to Bifurcate Trial (Dkt. 56) is **DENIED**.  The Court finds that evidence of the amount of money Defendant made from treating Patient X is potentially relevant to the jury's consideration of whether Defendant acted with malice or reckless indifference to Plaintiff's rights.  For example, were the evidence to reveal that Defendant netted $100,000.00 from Patient X's care, and only has a net-worth of $1,000,000.00, a jury

could decide that Defendant acted without regard to Plaintiff Dysart's rights in preservation of its fiscal interests.

Defendant's Motion to Supplement the Summary Judgment Record (Dkt. 68) is **DENIED**.

V.   **CONCLUSION**

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Plaintiff's Partial Motion for Summary Judgment (Dkt. 34) is **GRANTED**;

2. Defendant's Motion for Summary Judgment (Dkt. 45) is **DENIED**;

3. Defendant's Motion in Limine to Bifurcate Trial (Dkt. 56) is **DENIED**;

4. Defendant's Motion in Limine regarding Medicare/Medicaid Compliance (Dkt. 57) is **DENIED**;

5. Plaintiff's Motion in Limine regarding Patient X's Defining Characteristics (Dkt. 58) is **GRANTED**;

6. Plaintiff's Motion in Limine regarding Medical Justification for Discrimination (Dkt. 59) is **DENIED**; and

7. Defendant's Motion to Supplement the Summary Judgment Record (Dkt. 68) is **DENIED.**

**DONE** and **ORDERED** in Tampa, Florida, this 2nd day of March, 2015.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person